# Commonwealth ex rel. Howard J. Reeder *versus* Robert E. Pattison.

1. The provision of § 16 of the schedule to the new Constitution, that " after the expiration of the term of any president judge of any Court of Common Pleas, in commission at the adoption of this Constitution, the judge of such court, learned in the law and oldest in commission, shall be the president judge thereof," applies not only to judges whose commissions were in force at the time of the adoption of the said Constitution, but also to all judges who may be subsequently commissioned. It is of permanent and not of temporary force.

2. In 1874 and subsequently to the adoption of the new Constitution A. was commissioned as president judge of the Third Judicial District. In 1881 an Act of Assembly was passed providing for the election of an

" additional law judge " of said district, to be elected " in the manner prescribed by law for the election of president judge, and " to hold his office for the same term as the president judge." B. was elected and commissioned under said Act as " additional law judge." Subsequently on the expiration of A.'s term C. was elected as his successor.

*Held*, that B. and not C, was entitled to the commission of president judge of said district.

February 27th, 1885. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

ERROR to the Court of Common Pleas, *of Dauphin county :* Of May Term 1885, No. 13.

This was a petition by Howard J. Reeder, praying that a mandamus might issue against Robert E. Pattison, Governor of the Commonwealth of Pennsylvania, commanding him to deliver to the petitioner a commission as president judge of the Third Judicial District of said Commonwealth.

The facts, as they appeared from the petition, answer and replication, upon which the cause was heard, were substantially as follows :—

At the time of the adoption of the Constitution of 1874, the Hon. A. Brower Longaker was president judge of the Third Judicial District of the Commonwealth, consisting of Northampton and Lehigh counties. Subsequently in 1874 each of said counties was erected into a separate judicial district, Northampton county constituting the Third. At the general election of 1874 Hon. Oliver H. Meyers was elected as the judge of this district for a term of ten years, Judge Longaker having become the judge of the Thirty-first district, consisting of Lehigh county. In 1881 an Act of Assembly was passed, which provided for the election of an " additional law judge " for the Third Judicial District, to be elected " in the manner prescribed by law for the election of president judge, and to hold his office . . . for the same term as the president judge." (See Act of May 10th, 1881, P. L. 18.) Under this Act the Hon. W. W. Schuyler was elected and duly-commissioned as "additional law judge " of the Third Judicial District. At the general election of 1884 to fill the vacancy about to be caused by the expiration of Judge Meyers's term of office, Howard J. Reeder, the relator, was duly elected to succeed the former. The tickets cast at said election were separate tickets, reading as follows :—

" JUDICIARY.
" *President Judge*,
" Howard J. Reeder."

" JUDICIARY.
" *President Judge*,
" Oliver H. Meyers."

[Commonwealth *v.* Pattison.]

The official returns of said election showed that the relator had been elected " president judge " of the said district and a certificate to this effect was given to him by the prothonotary of Northampton County under the seal of the Court.

At the time of the said election and the returns thereof, Hon. W. W. Schuyler was serving in office under his afore-mentioned commission of "additional law judge." Hon. Robert E. Pattison, Governor of the Commonwealth, the above-named defendant, in December, 1884, issued a commission to the said Howard J. Reeder as " additional law judge," and not as "president judge," and at the same time issued to the said Hon. W. W. Schuyler a commission as "president judge" of the said District, whereupon the said Howard J. Reeder, on the 14th day of January, 1885, presented to the Court of Common Pleas of Dauphin county his petition asking that a writ of mandamus be issued directed to the said Robert E. Pattison, Governor of the said Commonwealth, commanding him to deliver to said Howard J. Reeder a commission as president judge of the said District.

The defendant filed an answer, which averred substantially that the relator was not elected to the office of president judge, but to that of "judge learned in the law;" that at the time of the said election, the Hon. WILLIAM W. SCHUYLER was and had been for a long time "a judge learned in the law" of said district, and upon the expiration of the term of the said Oliver H. Meyers, on the first Monday of January, 1885, the said WM. W. SCHUYLER, being then a judge learned in the law and oldest in commission of the said judges in said district, by virtue of the 16th section of the schedule of the Constitution of this Commonwealth, became president judge of the several courts of said district and was duly commissioned as such, and that there is consequently no warrant or authority of law under which the relator is entitled to a commission as president judge of said district. That there was no authority under the Constitution of this Commonwealth or under any statute passed in pursuance thereof for the form of votes cast at the said election for the relator as "president judge," and said votes could not and did not operate to elect the relator to the office of president judge of said district, but only to the office of a "judge learned in the law" in said district.

The court below in a per curiam order refused the peremptory mandamus. The relator thereupon took this writ of error, assigning as error the said refusal of the court.

*Lyman D. Gilbert* and *W. S. Kirkpatrick* (with them *Frank Reeder*), for the plaintiffs in error.—The operation of section 16 of the schedule to the new Constitution is limited and

restricted by the very words thereof, to the terms of judges in commission at the adoption of the Constitution. It is a section, not of the Constitution itself, partaking of its solemnity and permanence, but is a part of the schedule, attached to the Constitution to serve temporary purposes only. Apart from its words, it is clear on reason and authority that the schedule is no part of the Constitution, but simply auxiliary thereto, and designed for temporary purposes only. As such it has no permanent force, and it would therefore be most unreasonable to attempt to bring this case within its provisions. It is more than a decade since the Constitution went into operation; two judicial apportionments of the State have been made since the amendments of 1874 became the permanent law of the Commonwealth, and the schedule has long since, in the language of Judge GIBSON, been "stowed away in the lumber room of the Government," and it cannot again be materialized to affect, color, or abridge either the personal or official rights of any citizen: Commonwealth *v.* Clark, 7 W. and S., 133; Commonwealth *v.* Collins, 8 Watts, 348; Harrison *v.* Courtright, 7 Leg. Gaz., 406. The appellee, in order to sustain his theory that the president judge is chosen by the rotatory system and is not elected by the people, has grouped all the Common Pleas judges of the State under one general head and one generic term. This is done by attempting to create a titular office, which it names "judge learned in the law," and it is contended that from among the incumbents of this hitherto unknown office the president judges of the several Courts of Common Pleas shall be selected by the operation of law and the seniority of their commissions.

There is no warrant to be found either in the Constitution nor in our statutes for this ingenious, but illogical, view of the law.' It is true that the phrase "judge learned in the law" does frequently occur in the Constitution and in our statute books, but it is nowhere used with a titular significance. Wherever the phrase is employed it is used descriptively and for the purpose of discriminating between law judges and lay judges. It includes three separate and distinct classes of judicial officers, whose titular designations are "president judges," "additional law judges," and "Orphans' Court judges." Each class stands by itself and derives its powers and claims to office directly from the people.

An examination of the provisions of the Acts of Assembly of 1874 and 1883, providing for the judicial apportionment of the State, will show the correctness of this view, as well as the construction which the Legislature has put upon the section of the schedule cited. The Act of May 10th, 1881 (P. L. 18), moreover, under which Judge SCHUYLER was elected, distinctly

and expressly creates the office of additional law judge as one apart and distinct from that of president judge, and provides that the former shall be elected "in the manner prescribed by law for the election of president judge." Unless, therefore, the office of president judge be an elective one, the Act is meaningless and inoperative.

*Robert Snodgrass* and *Lewis C. Cassidy*, Attorney General, for the appellee.—Upon the adoption of the new Constitution, the offices of president judge and additional law judge disappeared from the judiciary system of the State. Thenceforth all judges then in commission or to be subsequently elected became merely "judges learned in the law"; the provisions of the Constitution and the debates of the Constitutional Convention will show that this change was made for the very purpose of destroying the distinction between president judges and additional judges, and the sixteenth section of the schedule was designed to provide for a succession which would meet all cases. It is clear that this section has both a temporary and continuing force, temporary as relating to judges in commission at the time of the adoption of the new Constitution, and permanent in affecting all judges subsequently commissioned. This is the construction which the State Department has uniformly placed upon the section of the schedule cited. The cases cited by the appellant are without force, as they construe the schedule to the Constitution of 1838.

*George Junkin*, for W. W. Schuyler.

Mr. Justice STERRETT delivered the opinion of the court May 18th, 1885.

The single question presented by this record is whether, under the admitted facts, the Constitution prescribes a rule for determining which of the present judges of the Third Judicial District should be commissioned as president of the several courts therein. If it does, every Act of Assembly inconsistent therewith must yield. If, on the other hand, the case before us has not been provided for by the Constitution of 1874, it is equally clear the Acts relied on by the relator are not only in force, but they fully sustain his contention and entitle him to a commission as president judge of the district.

In the body of the Constitution there appears to be no provision for determining the right of succession to the office in question. Indeed the office of president judge, as such, is not even recognized in the judiciary article. Judges of the inferior courts are there spoken of simply as "judges of the Court of Common Pleas," "judges required to be learned in the law,"

"judges learned in the law," "additional law judges," etc. The seventeenth section makes provision for determining "priority of commission " in cases where two or more judges of the Common Pleas for the same district are elected at the same time. The omission to provide, in the judiciary article, for succession to the president judgeship is significant and even suggestive of a purpose to change the previously existing system, in that respect, and make provision therefor elsewhere in the Constitution. We accordingly find that provision has been made in the schedule for every contingency that can possibly arise in the several courts of the first and fifth judicial districts, and at least partial, if not full and complete provision for all other Courts of Common Pleas. The eighteenth section of the schedule declares, "The Courts of Common Pleas in the counties of Philadelphia and Allegheny shall be composed of the present judges of the District Court and Court of Common Pleas of said counties until their offices shall severally end, and of such other judges as may from time to time be selected." After designating by name &c., the judges who, for the purpose of first organization, shall compose each of the four courts in Philadelphia, the same article further declares, "The judge first named shall be the president judge of said courts respectively, and thereafter the president judge shall be the judge oldest in commission ; but any president judge re-elected in the same court or district shall continue to be president judge thereof." This latter provision is substantially a repetition of a clause in the sixteenth article of the schedule. In like manner, after providing for first organization of the two Courts of Common Pleas of Allegheny county, the following section prescribes the same rule of succession to the president judgeship of those courts. These sections of the schedule, in connection with the provision, heretofore referred to, for determining "priority of commission," form a complete system, providing for every contingency that can possibly happen in either of the courts of those two districts. The most prominent feature of the system is that the judge senior in continuous service in each of said courts shall be the president thereof. In 1877, upon the resignation of the president judge of the Court of Common Pleas Number One of the Fifth District, the question arose, which of the remaining judges should be commissioned to fill the vacancy. The judge holding the more recently dated commission had been longer in continuous service than the other, and the Governor, being advised by the then Attorney General that the phrase "oldest in commission," meant "oldest in continuous service," without regard to the date of the commission under which he was then serving, issued the commission accordingly. So far as we know,

[Commonwealth v. Pattison.]

this construction, as to the correctness of which we entertain no doubt, has ever since been adhered to by the executive department.

The sixteenth article above referred to contains a permanent clause of general application, under which president judges when re-elected become their own successors. It also provides for the special case of courts composed of two or more judges learned in the law, all of whom are elected at the same time, by declaring "they shall decide by lot which shall be president judge." The fifteenth article says, "Judges learned in the law of any court of record, holding commissions in force at the adoption of this Constitution, shall hold their respective offices until the expiration of the terms for which they were commissioned, and until their successors shall be duly qualified." This of course embraces all president judges then in commission, and in effect declares that every such president judge shall hold the office until the expiration of his term and until his successor shall be duly qualified. The next inquiry naturally suggested is, who shall be president judge of the respective courts thereafter, that is to say, when a vacancy occurs at any time after the expiration of commissions in force at the adoption of the Constitution? The answer is found in the first clause of the sixteenth article, viz.: "The judge of such court learned in the law and oldest in commission shall be the president judge thereof." Construing the fifteenth section, so far as it relates to president judges, in connection with the first sentence of the sixteenth section, we have substantially this provision, viz.: President judges in commission at the adoption of this Constitution shall hold their respective offices until the expiration of the terms for which they were commissioned, and thereafter the judge, of each court respectively, learned in the law and oldest in commission, shall be the president judge thereof. This general rule of succession is of course qualified by the two special provisions above referred to as contained in the first sentence of the sixteenth article. Thus construed, every provision of the article is permanent and we have a uniform rule, applicable alike to all courts of common pleas, by which to determine the succession to the president judgeship in every possible contingency. We have no doubt this was what was intended, but the thought was not as clearly expressed perhaps as it might have been. It is a mistake to suppose the word "after," with which the sixteenth section commences, is employed in the sense of "upon," thereby limiting the application of the rule of succession to the single event of the expiration of each commission in force at the adoption of the Constitution. It was evidently used in the sense of "thereafter" referring

not only to the expiration of the respective commissions then in force but to the expiration of every subsequent commission. If we construe it otherwise we are forced to the unreasonable conclusion that the first clause of the sentence is only a temporary provision, while the others are permanent.

The idea of establishing a rule, by which the judge oldest in continuous service will be president of the court, is neither new nor unnatural. In this state it was first embodied in the amendment of 1850, providing, inter alia, that the judge of this court, "whose commission will first expire shall be chief justice," &c. The same provision is incorporated in the present Constitution; and we have no doubt it was the intention of the framers of that instrument to apply the same rule to the several courts of Common Pleas throughout the state, and we think they have done so in language that does not fairly admit of any other reasonable construction. My first impression was otherwise, but a careful examination of all the provisions relating to the subject satisfied me that the framers of the Constitution intended to establish a uniform system, whereby the judge oldest in commission in each of the courts of Common Pleas should be president judge thereof, subject to the temporary qualification that president judge in commission at the adoption of the Constitution should continue to serve as such, notwithstanding they might have associates, learned in the law, who were their seniors in continuous service. I now recall at least one case within the protection of that provision—a president judge who was the junior, in service, of one of his associates on the bench.

We find no error in the judgment of the court below. If the president of the Third Judicial District had been re-elected at the last general election, he would have been entitled to his commission as president judge, but, failing to be re-elected, the governor rightly commissioned his former associate, learned in the law, as president judge.

Judgment affirmed.